UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KATHY SIDI, Adm'trix, et al.,                       Case No.: 1:13cv242

       Plaintiffs,                                         Judge Michael R. Barrett

    v.

CITY OF CINCINNATI, et al.,

       Defendants.

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment of Defendants City of Cincinnati, Mark McChristian, Timothy Lanter, and Matthew Vogeler. (Doc. 33). Plaintiff Kathy Sidi for the Estate of Mohamed Ould Mohamed Sidi has filed a response in opposition. (Doc. 36). Defendants have filed a reply. (Doc. 37). This matter is ripe for review.

**I.    BACKGROUND**

    **A.    Facts**

Defendants Mark McChristian, Lanter, and Vogeler are employees of the Cincinnati Police Department. (Doc. 33-1, PageId 198; Doc. 33-2, PageId 202; Doc. 33-3, PageId 206). On or about 11:40 p.m. on a dry March 11, 2011 evening, Defendant McChristian, a police officer for the City of Cincinnati, attempted to stop a red 2006 Toyota RAV 4 vehicle after a suspicious interaction that led him to find out that the vehicle was stolen. (Doc. 33-1, PageId 198, 200; Doc. 33-2, PageId 202-03).[1] The officers later learned that the driver of the RAV 4 was Mark Gerth. (Doc. 33-1, PageId 198; Doc. 32-2, PageId 202; Doc. 33-3, PageId 206).

---

[1] There is a dispute as to the precise time the pursuit began because one cruiser's video recording shows times corresponding to approximately 11:40 p.m. on March 15, 2011 while the other cruiser's video recording shows times corresponding to approximately 12:40 a.m. on March 16, 2011. The parties generally have agreed throughout the case that the incident took place at or around 12:40 a.m. on March 16, 2011, and Plaintiff's expert appears to rely on that timing in his report. (Doc. 36-1, PageId 241, 244-45, 53). The Court, however, construes the evidence in the

1

Defendants submitted the video recordings from the cruiser cameras of McChristian and Lanter with their motion for summary judgment, along with affidavits of McChristian, Lanter, and Vogeler.[2] Plaintiff submitted the expert report of Stephen Ashton. The relevant evidence is as follows.

McChristian's video recording begins at a time stamp of 23:39:13 on March 15, 2011 with McChristian attempting to stop the RAV 4. (McChristian MVR). The RAV 4 pulled over to the right side of the street, appearing to stop as McChristian pulled in behind him. (Id.). After pausing for several seconds, the RAV 4 accelerated to the right around a corner at 23:39:52, and McChristian followed, activating his lights and siren. (Id.).

Lanter's video begins at a time stamp of 00:38:16 on March 16, 2015 with Lanter approaching McChristian as he attempted to pull over the RAV 4. (Lanter MVR). On Lanter's video recording, McChristian began his pursuit of the RAV 4 at approximately 00:39:02, activating his lights and siren. (Id.). Lanter identified himself over radio communication that he was the secondary vehicle involved in the pursuit and that McChristian was the primary pursuit unit at or around 00:40:08 on Lanter's video recording. (Id.; *see also* Doc. 33-2, PageId 202). He then re-notified communications over his radio that he was the secondary and McChristian was the primary pursuit unit on or around 00:41:37 on his video recording. (Lanter MVR; *see also* Doc. 33-2, PageId 203). At 00:41:49 on his video recording, Lanter notified communications of the speed of the pursuit. (Lanter MVR; *see also* Doc. 33-2, PageId 203). Throughout the pursuit, Lanter provided constant updates to communications on his location and direction over the radio. (Lanter MVR). Vogeler served as the supervisor for the downtown

---

light most favorable to Plaintiff by relying on the video recording reflecting a time of around 11:40 p.m. on March 15, 2011. It is noted that the minor time discrepancy does not alter any of the conclusions reached herein.

[2] The Court previously declined to consider the video recordings in ruling on the City Defendants' motion to dismiss.

services united of the Cincinnati Police Department and took control approximately 15 seconds into the pursuit. (Doc. 33-3, PageId 206).[3] Vogeler monitored the updates from the officers by radio communications and did not determine that the pursuit created an unreasonable risk to civilian life or property. (Id., PageId 206-07).

The first civilian vehicle is seen at 23:41:52 on McChristian's video recording. (McChristian MVR). The vehicle is on the opposite side of the road and has pulled over to the curbside. (Id.). The next vehicle is seen crossing an intersection at 23:42:14 before the RAV 4 reaches that intersection. (Id.). Additional vehicles are seen on the opposite side of the road at approximately 23:42:29 and 23:42:36 on McChristrian's video recording. (Id.). Each of those vehicles stopped or yielded to the officers and McChristian likewise yielded to those vehicles. (Id.).

Around 23:42:46 on McChristian's video recording, McChristian loses visual contact with the RAV 4. (Id.). Approximately thirty seconds later, McChristian and Lanter resume their pursuit of Gerth after having re-encountered him when he turned down a cross street going in the opposite direction. (Id.; *see also* Lanter MVR). Up through this point, McChristian and Lanter have paused at each stop sign or intersection and proceeded into no oncoming vehicular or pedestrian traffic. (*See generally* McChristian MVR; Lanter MVR).

At approximately 23:43:54 on McChristian's video recording, the RAV 4 encounters vehicles traveling in the same direction as it while making a left hand turn. (McChristian MVR). After the RAV 4 passes, the vehicles pause in the road as McChristian's vehicle passes them. (Id.). As McChristian follows the RAV 4 down a hill, the RAV 4 approaches an oncoming vehicle as well as a vehicle traveling in the same direction as it, maneuvers between them, and

---

[3] To the extent Plaintiff's expert concludes, as explained *infra*, that the officers never communicated speeds to Vogeler during the pursuit, the video recording plainly contradicts that conclusion.

continues to accelerate down the hill. (Id.). As the vehicles pause and pull to the side of the road, respectively, McChristian yields to them and continues down the hill following the RAV 4, again pausing at all stop signs and red lights. (Id.). At 23:45:08, the RAV 4 reaches the bottom of the hill where other officers have attempted unsuccessfully to utilize stop sticks to end the pursuit. (Id.). The RAV 4 then continued straight through the intersection into the downtown area. (Id.). As McChristian paused at three red lights, the RAV 4 proceeded into the downtown area and crashed into a cab as it entered the intersection of Sycamore Street and Eighth Street. (Id.). Mohamed Ould Mohamed Sidi and Tonya Hairston, the two occupants of the cab, were killed. (Doc. 33-1, PageId 201). At the time of the crash, McChristian was at least two blocks behind the RAV 4 at the intersection of Sycamore Street and Central Parkway. (Doc. 33-1, PageId 201). Lanter also was several blocks behind the RAV 4 at the intersection of Sycamore Street and Reading Road, having paused at all red lights and stop signs. (Doc. 33-2, PageId 204). When McChristian approached the intersection of the crash the time stamp on his video recording was approximately 23:45:51 while Lanter's time stamp on his video recording was approximately 00:45:05. (McChristian MVR; Lanter MVR).

    As a result of the crash, Gerth was convicted and sentenced on two counts of murder, one count of aggravated vehicular assault, one count of failure to comply, two counts of hit and skip, and one count of receiving stolen property. (Doc. 22, PageId 146; Doc. 33-1, PageId 201; Doc. 32-2, PageId 204).

    Plaintiff's expert, Stephen Ashton, provided various conclusions and opinions in his report. As relied upon by Plaintiff, Ashton concluded that the impact speed of the crash with the cab was approximately 55 miles per hour and that McChristian and Lanter operated their vehicles in a range of 61 to 81 miles per hour during the pursuit with an average speed of 72

miles per hour. (Doc. 36-1, PageId 226, 252). When the RAV 4 was fleeing shortly before and after crossing Central Parkway, its estimated speed was 78 to 80 miles per hour. (Id., PageId 241, 252-53). Ashton concluded that the pursuit was not conducted in accordance with the Cincinnati Police Department Policies and Procedures and the officers presented a significant risk to officers, occupants, and other citizens. (Id, PageId 253). On the whole, Ashton opined that "the manner in which the officers pursued the occupants of the RAV4 constituted reckless and wanton misconduct." (Id, PageId 226). He also opined as to specific violations of the policy and procedures that the speeds were not provided as required by the policy and procedures and that the primary unit and pursuit supervisor failed to terminate the pursuit in violation of the policies and procedures because the dangers involved outweighed the necessity for immediate apprehension. (Id.).[4]

### B. Procedural History

On March 27, 2014, the Court granted in part and denied in part the City's Motion to Dismiss, dismissing the federal claims against Defendants McChristian, Lanter, Vogeler, and the City of Cincinnati but allowing the case to proceed on all state law claims against Defendants McChristian, Lanter, Vogeler, and the City of Cincinnati. (Doc. 27). On August 11, 2015, Defendants McChristian, Lanter, Vogeler, and the City of Cincinnati filed a motion for summary judgment seeking to dismiss the remaining state law claims against them. (Doc. 33).

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[4] The Court relies upon the briefing of Plaintiff to identify the relevant opinions and conclusions. (*See* Doc. 36, PageId 220). It also is noted that Defendants provide the Affidavit of Lieutenant Aaron Jones to contradict the opinion of Ashton, as Jones opines that there were no violations of Cincinnati Police Department Policies and Procedures. (Doc. 33-4, PageId 208). Because the Court must construe the evidence in the light most favorable to Plaintiff, this evidence is not relied upon herein.

56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The Sixth Circuit has explained this Court's duty when considering a motion for summary judgment:

> A district court need only consider the evidence presented to it when considering a motion for summary judgment, regardless of whether other potentially relevant evidence exists somewhere in the record. *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007). A district court has no "'duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Id.* (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 n.7 (5th Cir. 1992)). Thus, "[r]ule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Williamson*, *supra*, 481 F.3d at 379 (quoting *Skotak*, *supra*, 953 F.2d at 916 n.7).

*Parsons v. FedEx Corp.*, 360 F. App'x 642, 646 (6th Cir. 2010).

### III. ANALYSIS

The City Defendants argue that they are entitled to summary judgment on the state law claims against them. The Political Subdivision Tort Liability Act, as codified in Ohio Revised Code Chapter 2744, requires a three-tiered analysis to determine whether the City Defendants are entitled to immunity. *See Cater v. City of Cleveland*, 83 Ohio St. 3d 24, 697 N.E.2d 610, 614 (Ohio 1998). The first tier sets out a general rule that political actors are not liable for damages. Ohio Rev. Code. § 2744.02(A)(1). In the second tier, the Court must determine whether any of the five exceptions to the general rule of immunity is applicable. Ohio Rev. Code § 2744.02(B). The third tier of the analysis requires consideration of whether a defense to liability applies to restore immunity. Ohio Rev. Code §§ 2744.02(B)(1)(a)-(c), 2777.03.

#### A. Individual Defendants

Individual Defendants McChristian, Lanter and Vogeler generally are immune from liability, unless their acts and omissions were "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code. § 2744.03(A)(6). "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *See Anderson v. City of Massillon*, 134 Ohio St. 3d 380, 388 (2012). Reckless conduct is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.*[5]

The issue for resolution here is whether the Individual Defendants acted in a wanton or reckless manner.

---

[5] There is some Ohio authority that indicates that "when police officers pursue a fleeing violator who injures a third party, the officers' pursuit is not the proximate cause of the injuries unless their conduct was outrageous or extreme." *Whitfield v. City of Dayton*, 167 Ohio App. 3d 172 (2d App. 2006); *Lewis v. Bland*, 75 Ohio App. 3d 453 (9th App. 1991).

7

### 1. McChristian and Lanter

Officers do not have a duty to refrain from all police pursuits. *Sparks v. Klempner*, 2011-Ohio-6456, ¶¶ 20, 22 (10th App. 2011). "By itself, the fact that a danger arises when a police officer pursues a fleeing driver is insufficient to present a genuine issue of material fact concerning whether the officer acted recklessly." *Sparks*, 2011-Ohio-6456, ¶ 20; *see also Lewis v. Bland*, 75 Ohio App. 3d 453, 456 (9th App. 1991) ("The duty of police officers is to enforce the law and to make arrests in proper cases, not to allow one being pursued to escape because of the fear that the flight may take a course that is dangerous to the public at large.") (internal quotations omitted). As such, other evidence of wanton or reckless conduct is necessary to sustain a claim against the officers.

*Sparks* is instructive in this case. In *Sparks*, the appellate court held that the trial court erred by denying the officer summary judgment on the basis of immunity because the officer had displayed caution in following a stolen vehicle that could not have risen to the level of recklessness. 2011 Ohio App. LEXIS 5319, at *13.[6] Although she followed the suspect, she did so only to keep the suspect in sight to radio his location such that she tempered her pursuit to lessen the suspect's motivation to drive recklessly to evade her. *Id.* at *10. She also slowed and stopped at intersections and continued to run her lights and sirens. *Id.* at *11. At the time of the crash, she lagged approximately four city blocks, and twenty seconds, behind the suspect. *Id.* The court reasoned that "police officers do not have a duty to refrain from all pursuit" or to cease and desist once a suspect begins driving erratically. *Id.*

Here, reasonable minds could only conclude that the conduct of McChristian and Lanter did not rise to the level of recklessness. The pursuit took place in the very late evening hours on

---

[6] The Ohio Supreme Court has clarified that the terms willful, wanton and reckless are not interchangeable, and that wanton misconduct requires a greater degree of culpability than recklessness. *Anderson v. City of Massillon*, 134 Ohio St. 3d 380, 388 (2012).

a weekday night in March and lasted approximately six minutes.  McChristian and Lanter were the only two vehicles actively pursuing Gerth.  The undisputed evidence shows that McChristian and Lanter believed that there would be little or no vehicular or pedestrian traffic at that time, that there indeed was no pedestrian traffic, and that there was limited vehicular traffic.  The first vehicular traffic was encountered at least two minutes after the pursuit began.  While there is evidence that McChristian and Lanter were traveling up to 80 miles per hour at some points in the pursuit, the video recordings from the cruisers' cameras reflect that both officers displayed caution throughout the pursuit.  The officers utilized their emergency lights and sirens throughout the pursuit.  They did not closely follow Gerth, attempt to ram him, or attempt to run him off the road at any time during the pursuit.  They paused at every stop sign and red traffic light, yielded to moving civilian vehicles, and entered intersections only when it was safe.  McChristian lost sight of Gerth at one point in the pursuit, only to re-encounter him and continue the pursuit after turning down a cross-street.  The video recording of the cruiser camera also shows Lanter maintained communications with OCI during the pursuit.  Other officers were informed of the anticipated path of the fleeing suspect and attempted to terminate his flight with stop sticks, albeit unsuccessfully.  Further demonstrating the cautiousness of the officers is evidence that McChristian was at least two blocks behind Gerth at the time Gerth crashed his vehicle into the taxi cab.

     Plaintiff argues that evidence that the officers violated speed limits or departmental policy or procedure is sufficient to establish recklessness.  *See Sparks*, 2011-Ohio-6456, ¶ 23.  "It is well established that the violation of a statute, ordinance, or departmental policy enacted for the safety of the public is not per se willful, wanton, or reckless conduct."  *See Anderson*, 134 Ohio St. 3d at 388-89.  While such violations nonetheless may be relevant to determining

the culpability of a course of conduct, *see id.*, Plaintiff has presented no evidence that creates a genuine issue of material fact as to whether the officers knew or should have known that any failures to follow policy or procedures would create at least a known or obvious risk of harm that was unreasonable under the circumstances. Plaintiff presents evidence that officers violated policies or procedures by pausing rather than stopping at intersections and traveling in excess of the speed limits, but that evidence, at best, can be characterized as negligent under the totality of the circumstances. Even though the officers were speeding at times during the pursuit of a fleeing suspect who was traveling in the range of 70 to 80 miles per hour, the video recordings from the cruisers' cameras undisputedly show that the officers tempered their pursuit at appropriate and necessary times, and were mindful of the safety of other drivers. Further, as explained in *Scott v. Harris*, 550 U.S. 372, 385 (2007), "we are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive *so recklessly* that they put other people's lives in danger. It is obvious the perverse incentives such a rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights."[7] Such a perverse incentive would be created here if the Court found the officers reckless simply because they pursued, at speeds in excess of the speed limit, a fleeing suspect who himself was traveling at speeds beyond the posted limits.[8] As such, those violations of the policies or procedures fail to demonstrate that the officers' conduct was substantially greater than negligent conduct.

---

[7] While *Scott v. Harris*, 550 U.S. 372, 385 (2007), did not involve the Ohio statutory provisions at issue here, the reasoning is instructive and persuasive in this case.

[8] To the extent Plaintiff suggests that the officers' termination of the pursuit would have protected the public, *Scott*, 550 U.S. at 385, explains why ceasing the pursuit would not necessarily protect the public: "there would have been no way to convey convincingly to respondent that the chase was off, and that he was free to go. Had respondent looked in his rearview mirror and seen the police cars deactivate their flashing lights and turn around, he would have had no idea whether they were truly letting him get away, or simply devising a new strategy for capture. Perhaps the police knew a shortcut he didn't know, and would reappear down the road to intercept him; or perhaps they were

To the extent Plaintiff contends that the affidavit of her expert creates a genuine issue of material fact because he concluded that "the manner in which the officers pursued the occupants of the RAV 4 constituted reckless and wanton misconduct," the Court disagrees. That is a legal conclusion that fails to create an issue of *fact*.[9] As for the conclusion that the officers violated the policy and procedures by not terminating the pursuit because the dangers outweighed the necessity for immediate apprehension, that argument is a non-starter because, under the policy, the officer is required to terminate the pursuit when the pursuit OIC or the primary unit makes the discretionary determination that the level of danger created by the pursuit outweighs the necessity for immediate apprehension. As neither the OIC nor the primary unit made that determination, there is not a plain violation of the policy. While the expert may opine that the OIC or primary unit erred in making the discretionary determination not to end the pursuit, the evidence in its totality fails, as explained above, to demonstrate the necessary conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.

Accordingly, summary judgment is granted in favor of McChristian and Lanter with respect to the claim brought against them under Ohio Rev. Code. § 2744.03(A)(6).

2. **Vogeler**

The crux of the claim against Vogeler is that he acted at least recklessly in managing the pursuit of Gerth. Plaintiff, however, has cited to no evidence that creates a genuine issue of

---

setting up a roadblock in his path. . . . Given such uncertainty, respondent might have been just as likely to respond by continuing to drive recklessly as by slowing down and wiping his brow."

[9] While Plaintiff relies heavily on this Court's opinion with respect to the motion to dismiss, such reliance is misplaced. At that stage, the Court superficially considered the alleged facts for plausibility. The Court's opinion was not intended to determine that those alleged facts alone would ultimately be sufficient to withstand summary judgment. At summary judgment, the Court now has the benefit of reviewing the evidence as a whole, including the video recordings that it declined to review at the motion to dismiss stage. As such, the Court's prior decision on the motion to dismiss is not conclusive here.

material fact as to whether Vogeler acted recklessly. The only reference in her briefing to the conduct of the pursuit supervisor is the expert's conclusion that he violated policies and procedures by failing to terminate the pursuit. But, as explained previously, the discretionary decision not to terminate the pursuit was not a plain violation of the policies or procedures. Instead, the expert disagrees with Vogeler's discretionary determination not to end the pursuit. But the evidence in its totality fails, as explained previously, to demonstrate the necessary conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.

The undisputed facts instead demonstrate that Vogeler took command of the pursuit fifteen seconds after Gerth refused to stop. He monitored the location, direction, and speed of the pursuit by radio. He requested clarification of the units that were involved, including who was the primary unit and who was the secondary unit. Officer Lanter, at one point, indicated to Vogeler the speed of the pursuit. Neither officer sounded out of control or panicked over the radio. Based on that information, there is no evidence that Vogeler had reason to believe that the pursuit presented a known or obvious risk of harm that was unreasonable under the circumstances.

Accordingly, summary judgment is granted in favor of Vogeler with respect to the claim brought against him under Ohio Rev. Code. § 2744.03(A)(6).

### B. City of Cincinnati

There is no dispute that the City of Cincinnati is presumptively immune from liability for damages, as it was performing a governmental function by providing police services in trying to apprehend the driver of a stolen vehicle, and serving the common good in a way that "promotes or preserves the public peace, health, safety, or welfare." Ohio Rev. Code § 2744.01(C)(1)-

(C)(2). Here, the relevant exception to immunity is for negligent operation of a motor vehicle by the City employees when the employees were engaged within the scope of their employment and authority. Ohio Rev. Code § 2744.02(B). If that exception applies, then the immunity of the City of Cincinnati may be restored if "[a] member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct." Ohio Rev. Code § 2744.02(B)(1)(a).

The City of Cincinnati does not argue that the exception for immunity for negligent operation of a motor vehicle is inapplicable in this case. (*See* Doc. 33, PageId 190-93). Instead, the City of Cincinnati contends that its immunity is restored because the undisputed facts demonstrate that the officers were operating the motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct. (Id.).

Plaintiff does not dispute that the officers were operating the motor vehicle while responding to an emergency call. (*See* Doc. 36). Plaintiff instead argues that there is a genuine issue of material fact as to whether the officers' operation of their vehicles constitutes willful or wanton misconduct. (Id., PageId 215, 220-22).

Ohio courts have defined the term "willful misconduct" as a "deviation from clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Anderson v. City of Massillon*, 134 Ohio St. 3d 380, 388 (2012). "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.*

As the Court has determined that the officers did not act recklessly in the pursuit of Gerth, it is, for the same reasons previously stated, unable to find that the operation of the vehicles by the officers constituted willful or wanton misconduct.

Accordingly, summary judgment is granted in favor of the City of Cincinnati with respect to the claim brought against it under Ohio Rev. Code § 2744.01-.02.

## IV.     CONCLUSION

For the foregoing reasons, the City Defendants' Motion for Summary Judgment (Doc. 33) is **GRANTED**.  It is hereby **ORDERED** that all remaining claims against Defendants McChristian, Lanter, Vogeler, and the City of Cincinnati are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

s/Michael R. Barrett<br>
MICHAEL R. BARRETT, JUDGE<br>
UNITED STATES DISTRICT COURT